Next case is number 093063 Woodworth v. Department of the Navy. Mr. DeMille. May it please the court. My name is Frank DeMille. I am here representing Petitioner, Mr. Kent Woodworth. As we know, this is the second time that we've been before this court in this particular issue, in this particular case. However, on appeal, we have a very narrow issue. And we're here to determine whether or not Mr. Woodworth's protected activity was a factor in the agency's decision not to extend his overseas duty was supported by substantial evidence by the board. It is clear after reviewing the evidence in this case that the board's decision is not supported by substantial evidence. As we know, an employee who wants to demonstrate that... Actually, just so maybe I can focus your argument. Yes, ma'am. It seems to me that you're really asking us to rewrite the evidence in this case. There were credibility determinations, and the argument isn't that the A.J. didn't consider the evidence. You're just different with conclusions the agency came to, having listened to the testimony and evaluated the testimony. In essence, there is a harmful error here. The A.J. in his decision didn't consider all the evidence that was available in the particular case. And not all. And this has to consider every single piece of evidence. But he has to at least resolve the particular evidence that goes contrary to his particular determination. Are you talking about the e-mail here? Yes. Was there any other evidence that you think the A.J. ignored? Yes. There was evidence on... I think it's regarding the process of extending return rights. And that process was taken... Basically, it was a six- to eight-month period where the agency, before these return rights expired, the agency would begin the process of returning these and discussing these return rights and determining what they were going to do. The agency didn't identify any particular evidence that suggested that they were actually going to extend Mr. Woodworth's return rights. Essentially, during this time period, it was inaction by the agency which supports the conclusion that they were going to actually not extend his return rights. And that essentially that Mr. Woodworth was advised by his first-line supervisor at the time that he was... Their contention was made in October. Their contention was made in December. Right. You're asking us to re-weigh all of the evidence to reach a different result than the A.J. I guess I'm just not seeing... I mean, you could agree there was significant evidence on the side of the government here in terms of testimony, you know. Right. I don't necessarily agree with that. The only evidence that I see in this case is that Mr. Woodworth had eventually exercised, you know, his return rights. However, if you look at the statements made by the agency, they had convenient lapses of memory. The judge can't sit there and say at one point and say, all right, I'm going to believe this particular witness' testimony because it was straightforward. But at the same time, every time they are asked a question about, you know, a particular issue that's contrary to their, you know, their position, they can't remember. And the agency hasn't really proffered any sort of... Well, the problem for you, I think, is that that's their job and not our job. You're asking us to sit back here to read the entire transcript to put ourselves in... I mean, how are we to assess whether you think they should be credited this person because other times they can... In your view, they can conveniently forgot. How are we supposed to do that if you're on appeal? Right. To second-guess the agency's conclusions with regard to those matters. Right. And I understand that completely. But I think what it comes down to is this electronic mail message in that it's document evidence. The judge didn't address the electronic mail message. If he were to resolve that and said, fine... Evidence of what? Of the decision being made by the first-line supervisor that they weren't going to, you know, extend these return rights. Well, I guess I'm reading the email differently. Why can't we view the email as just a prediction by the first-line supervisor that your claim was a certain baseless whistleblower claim if one or several courses of action were taken? Why does it say anything more than that? This is – I think what we're looking at here is that the decision was made and that they were trying to manage how they were going to respond to his potential claim. And they were well aware... Well, the decision was made by whom? You said the email involved comments by his first-line supervisor. That what he was not the decision-maker. Right. And the second-line... The decision-maker was Colonel Armstrong. Right. So he wasn't implicated in the statement made in the email, correct? Well, I think this was a discussion between the two – the second-line supervisor and the first-line supervisor. Essentially following whatever the first-line supervisor's recommendation may be. It's clear from the electronic analysis... You probably still haven't heard that. What's in the email? When Colonel Armstrong didn't say anything in the email about having made a decision. Right. Well, the email essentially – I think if you look back at it, what the email is doing is it's assessing this risk. And if you read between the lines of what the actual – the basis of this electronic mail message was actually sent, the reason it was sent was it was weighing these particular – the particular benefits, or I guess the cost-benefit analysis between – and not extending and extending. Who was the first-line supervisor? First-line and second-line. Okay. You read it as being Colonel Armstrong voting for President Trump? I view it as him advising the colonel as to what sort of action is appropriate to take and that the colonel would just essentially – or that this action would be taken and that it would move forward on whatever his recommendation may be. How do we know that? I mean, that's an inference you're drawing. Right. There's no documentary evidence to support it. There's something in the email that says, and I know that you're going to accept this because you'll accept it just at face value. And then Colonel Armstrong says, yes, you're right on that. So the email doesn't indicate anything of the sort, right? Well, it doesn't necessarily indicate that he would make that decision. But I think reading between the lines of the electronic mail message, it's clear that they've already made this decision, and they were just weighing, okay, how can we affect this action without an insulative source of liability? I think that's what the email record demonstrates, and that's what needs to be resolved. Now, the email doesn't demonstrate that. You've just said that that's what we ought to conclude by reading between the lines. Right. Which is not what the – I mean, by definition, if you read between the lines, it's not the line which is the email or email. Right. That's the inference you're drawing. Right. And that's essentially the issue in this case, is that if the judge were to resolve this email and resolve this issue, then the credibility would just be a credibility standing. But his failure to really look at and weigh all these particular issues, the lack of the agency's inaction for several months, this electronic mail message, which is just out there and is out there as evidence contrary to his particular findings, the fact that the witnesses weren't – had convenient memory lapses, all these issues that tend to run contrary and are evidence contrary to his determination, he hasn't resolved. His decision was, you know, a scant six pages that really didn't address any of these particular issues. If he were to make a decision on that particular basis and resolve those issues, we wouldn't be before this Court today. But because he failed to essentially resolve these issues, that's really why – you know, why there's a substantial amount of error in here and that there's, you know, really no reason to really believe the agency's version of events versus Mr. Walker's versions of the events. The agency's decision, looking back at it again, also points to a myriad of other factors that would support the intent of Mr. Woodward. And these particular factors are in no way really relevant to these proceedings. There's no evidence – there was no evidence that Mr. Woodward disclosed his particular intentions regarding his family life, his son or any of all these issues that essentially, you know, that these were factors that he actually demonstrated to the agency and that that was actually the reason why they, you know, that Mr. Woodward exercised his return rights. So again, even looking at Mr. Woodward's credibility determination, the judge strikes at that as well and there's really no basis for that as well either. You know, he also questions Mr. Woodward's, you know, his failure to confirm this yes or no, this no response that he received. That's completely not in line with the exact processes that are taken with the agency in this particular situation. How clear do you believe it is on the record that he would have been extended but for all of this interaction and exchange and discussion? Well, I think that's the issue. There's another issue in the case that hasn't been – that wasn't necessarily supported by the agency's determination. The – there was no – Mr. Woodward's length of time in that he was spent overseas was not unusual. It was not abnormally long. This was – you know, it was longer but it was not the unusual case in the situation. Additionally, there was no – there was no indication by his home base that they weren't going to extend his return – or they weren't going to extend his duty at that time in December. And the agency in the past has taken – has come to Mr. Woodward and has extended his return rights prior to – prior to receiving notification from the home base. So with these factors, it's pretty clear that, you know, that there's not – there's – the – essentially the return rights were essentially unknown. And that, you know, that we don't really know what sort of action could be taken based on Mr. Woodward's eventual exercise of his return rights. But that's the dilemma, isn't it? Yes. Here we have someone who on the record shows the sort of unhappiness, discontent with the appointment and an interest in returning home. And then when the choice is no longer available, complains. Right. He needs to make a pretty good case that he was entitled to stay, expected to stay, that his work was superior. I don't know if that's an issue. I think there was no concern about the quality of his performance. But it's very hard to find someplace where he was entitled to feel that he was entitled to a reacquaintment. Right. And, you know, is there – you are correct in that there was no issue with his performance. There was really – when you get back to his unhappiness, he characterized that as harassment of his first-line supervisor. So, you know, I think he was looking for a remedy for the issue that he raised. And he was very, you know, concerned with effecting this remedy. But that by no means could be, you know, I guess could be construed as a determination that he wanted to exercise his return rights and return home. What remedy is he seeking in this case? In – I'm sorry, in the whistleblower case or in this current case? In this case before – You know, we would either – I mean, of course, we would request that, you know, it be overruled. But in the same notion, you know, remand either for further consideration by the AJ to resolve these issues that are outstanding. But what if he wins? I mean, if he were to prevail, what's the relief in this case? I think, you know, I think he's still very concerned that he hasn't been returned, you know, that he was forced to return back to, you know, the U.S. before he was ready. He has – So is he seeking to go back there for another term at this stage? I don't – at this point, it's not clear what – I mean, this – I mean, the action being taken in 2000, I think he's just looking to, you know, recover his particular losses between the, you know, the 2000 and this time period. It's almost 10 years since the actions have been taken. So it's really hard for him to articulate what, you know, what sort of issues that he's – Is there any discrepancy in payer benefits? You know, is that what he's seeking? A difference to the period? My understanding is that there – I'm not 100 percent sure, and I do apologize. But my understanding is there is a discrepancy with some of his pay and his issues. That's what he's seeking to recover. And also to see corrective action on, you know, the – to have someone – you know, he's pursuing the action mostly on the whistleblower. You know, he's also been pursuing the whistleblower action as well and seeking someone to really correct that particular action and remedy his concerns. So, you know, he's – I think that's what he's seeking in terms of relief from the situation. Let's hear from the government. Okay. I'm going to take this to the board. Mr. Kidd, please report. Mr. Woodworth has not and cannot show that the board's decision is unsupported by substantial evidence. It is clear that what he is seeking to have this court do is to re-rate the evidence, particularly with respect to the question of when the agency made its decision not to extend his overseas tour of duty and whether that decision was made before or after Mr. Woodworth voluntarily indicated his intention to exercise his return rights. Several agency witnesses, including the decision-maker in this case, Colonel Armstrong, testified before the administrative judge that the agency's decision was made only after Mr. Woodworth voluntarily decided to exercise his return rights. And the administrative judge who heard and saw those witnesses found their testimony credible. Mr. Woodworth has failed to present anything that would justify disturbing those credibility determinations. The board's determination is also supported by documentary evidence in the record. For example, the email dated December 21st from Colonel Armstrong indicating that he does agree that Mr. Woodworth's tour of duty should not be extended. The date of that email, of course, is after Mr. Woodworth's December 18th statement that he would like to exercise his return rights. There's also documentary evidence in the record consisting of a memorandum signed by Colonel Armstrong, also dated December 21st, where he concurs in the request of Mr. Regan not to extend Mr. Woodworth's overseas tour of duty. And finally, there is further documentary evidence of a series of emails that begin in late December 2000 and continue into early January 2001 between apparently administrative folks in Japan and those in California asking whether California is going to renew Mr. Woodworth's return rights and indicating that a final decision as to the extension of his overseas tour of duty will, to some extent, depend on that decision and then the decision by the California officials not to extend Mr. Woodworth's return rights. So there is certainly substantial evidence in the record to support the board's decision regarding when the agency made this decision, the fact that it was after Mr. Woodworth decided to exercise his return rights and therefore that this was not an instance of whistleblower retaliation. The email's a little suspicious, right? I mean, they're sort of predicting a potential whistleblower complaint before it happens, which kind of suggests that they have a sense that there was at least a potential allegation of whistleblowing going on here. I think there was a sense that there was a potential for Mr. Woodworth to raise a whistleblower claim. I think that is clearly what Mr. Riga is referring to in the last paragraph of his email on appendix page 56 in our appendix. But that comes at the end of a long list of explanations as to why Mr. Riga is recommending against extending Mr. Woodworth's overseas tour of duty. And he recites a number of reasons, including the length of time that Mr. Woodworth has been there, nine years, which is, he says, long. Not a record, but very long. He also remarks that Mr. Woodworth is not happy there, that he's having a deleterious effect on Brown, that after polling division heads within his division, all of them voted against extending Mr. Woodworth's tour of duty. So it's only after he recites a number of reasons that he feels that he would recommend extending Mr. Woodworth's tour of duty, that at the end he says, and if we do this, I recognize that it's possible he'll raise a retaliation claim. I don't think he'll be successful. In Colonel Armstrong's response, he doesn't really address that aspect at all. He's a little bit concerned with the timing of why the agency in Japan appears to have to make their decision. According to Mr. Rita, they have to make their decision before California makes their determination about renewing Mr. Woodworth's return rights. He has some concerns about that and wants to clear that up, and apparently doesn't make a decision at that point. It's not until a few days later, on December 21st, almost a week later, I guess, that he responds with an email again to Mr. Rita's recommendation,  but by that time Mr. Woodworth has already indicated that he wishes to exercise his return rights. Mr. Rita informs Colonel Armstrong of that, and in light of that, Colonel Armstrong responds that I agree that we should not extend his overseas tour of duty, but I'll go to bat and try to get his on-base housing extended at least until the end of his tour of duty. So again, it's clear that substantial evidence is in the record to support the Board's decision, and that what Mr. Woodworth is really asking us to do is to simply re-weigh that evidence, which of course is not the job of this committee. Do you see a remedy, even if you do win? What is the whole point of this? Well… Unless you get out of the leafy bill, this was not an adverse action. Exactly right. It doesn't appear on the paper, on the record. That's right. I wanted to mention that it is in the record that he was returned to his position in California at the same rate of pay that he had enjoyed when he was in Japan, so I don't even think there was any reduction in benefits. He challenged the action, the personnel action, of not extending his overseas tour of duty, so presumably the only remedy he could get would be an extension of that tour of duty, but it's not unusual in cases like this where so much time has gone by that that would require some reconstruction on the part of the agency and inquiry whether Mr. Woodworth would still be interested at this point, even in going back to Japan. So, you know, in cases like this where so much time has gone by, it's very difficult to say. In those cases, it can't be actually remedied. It can be remedied by compensation. By back pay, yes. Back pay and all that, but apparently that's not an issue here either because he got the same pay. That's exactly right. Receipts pay or whatever, but that's to compensate for being overseas, so that's not… So I don't understand what the piece of utteracy is here. Right. Just the, I guess, recognition that he would be seeking, that he was in fact subject to a lot of retaliation, if the court found. The government didn't raise this point, did you, by motion or whatever, as the case was proceeding through this court? Did we raise the point that there would be no remedy? Is that the question, Your Honor? That is, in fact, what sort of adverse action this is. Well, the question of whether it was a personnel action, a covered personnel action for purposes of the Whistleblower Protection Act, the board found that not extending his overseas tour of duty did qualify as a personnel action for purposes of the Whistleblower Protection Act and the agency did not challenge that below and did not challenge that on appeal. So it's not a traditional adverse action, but it doesn't need to be for purposes of the Whistleblower Protection Act. It only needs to be a covered personnel action. But an action without remedy, other than restoration, if things had moved faster than the many years that this took? Exactly right, Your Honor. The remedy would be to extend his tour of duty. And whether that could be accomplished at this late date and whether Mr. Woodward would even want to return, that's a separate question, which, of course, I can't answer whether he would want to return. But hypothetically, if the court reversed the board and the ultimate finding was that Mr. Woodward was subjected to retaliation, then presumably the remedy would be to extend his overseas tour of duty. But as a practical matter, it's difficult to understand exactly how that would be made to happen. But that would be the remedy. Whether it could be in practice effective, I'm not sure. Okay. Any more questions? Thank you, Your Honor. Mr. DeVolfi, you have a couple of minutes. Can I ask a question, just to make sure? Sure. I didn't get it from your answer when you were asked. Can you be a little more clear as to what it is you would get by doing this case? Well, I think that's something that's best handled on remand. If he were to—you know, there was no issue as to what his particular damages were. There should be a—if there was a damage hearing and a further testimony in that particular avenue in that aspect, we can determine what sort of, you know, difference in pay there was, what sort of issues he may have had, what sort of harm he has suffered from having his duty cut short in Japan and having to be moved back here today because he's employed at the stateside. So as to what he would receive, what sort of remedy he would have, I mean, that—I think that needs further testimony and further discovery. Well, I wasn't asking about—I was asking what you were asking for. What do you think he should have? You're asking what I— What do you think he should get? I think, you know, again, I think he's— I don't know what to ask for. I don't know how to put it. I realize the board would have to decide on all that. Right. Mr. Woodworth is, you know, seeking to be made whole on this particular issue. So, you know, he's looking forward to recover his, you know, actual damages and the differences to what those are. Those have to be something that's going to have to be articulated by him to the board and for, you know, further consideration. You know, he's harmed by having his duty cut short. He's been sent—you know, he's enjoyed his position in Japan. He had been there for several years, and he had a home and a house there, and that's where he lived. That's where he made his home. He had been cut short and sent back to the United States, essentially against his will, according to his position. And, you know, there's issues for him to explore there, and that's—you know, if my— I haven't really discussed with my clients whether or not he wanted to actually go back to Japan. That could be within his particular determination. He enjoyed that area. Okay. I'm tired. Okay. That's—I haven't anything further. I think I've stated everything on the— Is there anything further for the board? Thank you. Thank you. Thank you, Mr. Dilanfi, and we expect the case is taken under submission.